UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LISHA HAMLIN,
         Plaintiff,

         v.                                          CIVIL ACTION NO. 15-11797-MPK[1]

CAROLYN COLVIN, ACTING
COMMISSIONER OF THE
SOCIAL SECURITY
ADMINISTRATION,
         Defendant.

**MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION TO REVERSE
DECISION OF THE COMMISSIONER (#17) AND
DEFENDANT'S MOTION TO AFFIRM THE COMMISSIONER'S DECISION (#20).**

KELLEY, U.S.M.J.

# I. INTRODUCTION

Plaintiff Lisha Hamlin ("Hamlin") seeks reversal of the decision of Defendant Carolyn

Colvin, Acting Commissioner of the Social Security Administration ("SSA"), denying her

Disability Insurance Benefits ("DIB"). (#17.) Defendant moves for an Order affirming the

Commissioner's decision (#20), and Hamlin has responded. (#23.) As the administrative record

(#11) has been filed and the issues fully briefed (##17, 21, 23), the cross motions stand ready for

decision.

# II. BACKGROUND

## A. Procedural History

Hamlin applied for DIB on July 5, 2011. (TR[2] 105.) She alleged a disability onset date of

November 30, 2009, due to major depression, generalized anxiety disorder, PTSD, and ADHD.

---

[1] With the parties' consent, this case was reassigned to the undersigned for all purposes, including trial
and the entry of judgment, pursuant to 28 U.S.C. § 636(c) and Rule 73(b) of the Federal Rules of Civil
Procedure. (##27-29.)
[2] The designation "TR" refers to the Social Security administrative record. (#11.)

(TR 11, 268, 347.) Her application was denied initially and again upon reconsideration. (TR 9, 118, 121.) On January 24, 2014, a hearing was held before administrative law judge ("ALJ") Francis Hurley. (TR 9, 42-91.) At the hearing, ALJ Hurley heard testimony from Hamlin and vocational expert Diane Durr. (TR 42-43.) On February 27, 2014, the ALJ issued an unfavorable decision. (TR 9-36.) On March 26, 2015, the Appeals Council denied Hamlin's request for review. (TR 1-3.) With that, the ALJ's decision became final. *See Tefera v. Colvin*, 61 F. Supp. 3d 207, 2011 (D. Mass. 2014). On May 7, 2015, having exhausted her administrative remedies, Hamlin filed this action for review pursuant to 42 U.S.C. § 405(g). (#1.)

## B. Factual History

At the onset of her alleged disability, Hamlin was 46 years old. (TR 98.) She had past relevant work experience as a certified nurse's aide, customer service manager, director of materials, and unit associate. (TR 83.) Hamlin stated that she had not worked since September 2007 due to alcohol use. (TR 368.)

## 1. Medical Records from Treating Sources

Hamlin argues that the ALJ erred by failing properly to evaluate her impairments caused by alcohol use (in Social Security parlance, "Drug [or] Alcohol Abuse" or "DAA")[3] and mental health impairments. (#17 at 5-12.) As a result, the Court need only focus on Hamlin's mental health and DAA history, not her physical impairments.

## a. Initial Alcohol Rehabilitation: January 2008

Hamlin's relevant medical history begins on January 11, 2008, when she entered Stanley Street Treatment and Resources for inpatient alcohol detoxification. (TR 15, 359-60.) She had been drinking 2 pints of vodka daily since the year 2000, often drinking to the point of blackout.

---

[3] Social Security Ruling ("SSR") 13-2p, 2013 WL 621536 at *3 (S.S.A. Feb. 20, 2013).

(TR 1061, 1071.) She presented "full of unresolved grief" from her sister's recent death and her mother's illness. (TR 364.) Her affect was "depressed" and she was experiencing alcohol withdrawal. (TR 15, 357.) At admission her Global Assessment of Functioning ("GAF") was 45.[4] (TR 369.) She was discharged on January 15, 2008, when her alcohol detox was complete. (TR 15, 361.)

**b. Outpatient Treatment and Period of Sobriety: January 2008 through December 2011**

On April 1, 2008, Hamlin had an initial visit to the New Bedford VA Outpatient Clinic with nurse practitioner Eugenie Keel. (TR 1079, 1199, 1992.) Screening tests indicated depression, but not PTSD. (TR 1085-88, 1205-08, 1998-2001.) Ms. Keel wrote that Hamlin was attending AA meetings daily and had not had a drink since January 10, 2008. (TR 1081, 1203, 1994.) On April 9, 2008, when Hamlin had been sober for nearly 90 days, she had a comprehensive assessment with social worker Ronald Jolin at the same clinic. (TR 12, 15, 1067, 1078, 1187, 1980.) Hamlin had started taking mirtazapine and trazodone. (TR 1068, 1188, 1981.) She was unemployed "due to mental health limitation," and her activities included watching television, visiting her mother, and staying in bed all day. (TR 1075, 1194-95, 1988.) Mr. Jolin noted immediate memory impairment and difficulty concentrating/attending. (TR 1076, 1196, 1989.) He diagnosed major depression, generalized anxiety disorder ("GAD"), and alcohol dependence in early partial remission, with a GAF of 50. (TR 1077-78, 1197, 1990-91.) Her depression symptoms were "depressed mood; anger/irritability; decreased sleep pattern; tearfulness; depressed concentration; decreased activities and interests; decreased energy and lethargy; 10 lb weight gain and she tends to isolate at home in bed." (TR 1078, 1197, 1991.) Hamlin also presented anxiety symptoms of "excessive worry; restlessness; irritability; decreased

---

[4] A GAF score of 41 – 50 indicates "a serious impairment in social, occupational, or school functioning." (TR 15 (citing Diagnostic & Statistical Manual of Mental Disorders, 4th Ed. ("DSM-IV"), (1994)).)

sleep pattern; muscle tension; upset stomach; decreased concentration and being easily fatigued." (TR 1078, 1197-98, 1991.)

On April 21, 2008, Hamlin met with psychologist John Dmochowski for an initial evaluation. (TR 15, 1061, 1183, 1973.) Hamlin's symptoms included trouble falling asleep, guilt, and improved concentration and memory but still with some mind wandering and forgetfulness; her anhedonia and interest were improving. (TR 1061, 1184, 1974.) Her mood was euthymic, affect congruent, attention and concentration intact. (TR 1063, 1186, 1976.) Dr. Dmochowski diagnosed major depressive episode with melancholia and chronic alcoholism in early remission, and assigned a GAF of "55-45-49"[5] with a final score of 49. (TR 1060, 1063, 1183, 1186, 1973, 1976.) In his treatment plan on the same date, Dr. Dmochowski included "Post-Traumatic Stress Disorder," "Generalized Anxiety," "Panic Disorder," and "Depression" as conditions to be treated with medication and psychotherapy. (TR 1059-60, 1181-83, 1972-73.)

Hamlin returned to Dr. Dmochowski on June 16, 2008; he noted that she had recently moved to a new apartment and was "making good use of recovery [services]" at the VA. (TR 1055-56, 1178-79, 1965.) Again, he assigned GAF of "55-45-49." (TR 1057, 1180, 1967.) On June 17, 2008, Hamlin saw Mr. Jolin and reported moving to a nicer neighborhood. (TR 1964.) She had been staying sober, and mentioned "feeling less depressed since she was placed on some medication." *Id.* On July 24, 2008, Hamlin returned to Mr. Jolin, reporting increased depression. (TR 1963.) Hamlin was attending 2-3 AA meetings per day and avoiding drinking. *Id.* On August 5, 2008, Hamlin saw Ms. Keel, who noted "mood and [function] stable." (TR 1054, 1962.) On September 12, 2008, Hamlin called the VA to request assistance in finding part-time work, saying that she wanted to get out in the world again and help people. (TR 1047, 1173,

---

[5] The record contains no guidance on how to interpret this set of three GAF scores.

1952.) On September 29, 2008, Dr. Dmochowski wrote that Hamlin's "[d]epression, alcoholism are in temporary remission and I think her prognosis is good at this time." (TR 1050, 1955.)

Hamlin saw Mr. Jolin again on October 31, 2008, "frustrated about not working." (TR 1947.) She had decreased energy and felt depressed, although she also reported feeling better physically and hanging out with friends. *Id.* On November 10, 2008, Hamlin returned to Dr. Dmochowski, stating that she felt depressed, melancholy, irritable, and anxious, and had withdrawn to her bedroom for more than a month. (TR 1162, 1944.) Dr. Dmochowski found her "more subdued and depressed and anxious than she was last visit," and copied some text from his initial April 2008 notes. (TR 1163, 1945-46.) He rated Hamlin's GAF as "50-45-50." (TR 1164, 1945-46.)

On January 7, 2009, Hamlin reported to Mr. Jolin that she had started work as a unit associate at High Point Treatment Center and as an on-call worker at Steppingstone. (TR 1939.) Mr. Jolin noted that "she continues to feel depressed as she [complains of] decreased energy and lethargy… She will be celebrating her 1st year of sobriety on Saturday." (TR 1939-40.) Hamlin returned to Mr. Jolin on February 9, 2009, stating that she discontinued her medications because they upset her stomach. (TR 1938.) She was not sleeping well, continued to have "some depression," and experienced a lot of stress from working and going to school at BCC.[6] *Id.*

Hamlin had an initial visit with registered nurse Suzanne Tokarz on February 12, 2009. (TR 1936.) Nurse Tokarz wrote that Hamlin's mood was "depressed" and her affect "sad," and that she had maintained sobriety for 13 months. (TR 1937.) Following this appointment, Hamlin resumed taking her medications (Celexa, Wellbutrin, and Zolpidem). (TR 1935-36.) At a visit to

---

[6] Presumably Bristol Community College, although the record does not specify.

Nurse Tokarz on February 25, 2009, Hamlin stated that the medications were helping "a little."
(TR 1934.)

On March 30, 2009, Hamlin returned to Dr. Dmochowski, requesting medication to help
with her urges to drink. (TR 1926-27.) Dr. Dmochowski copied the text of his assessment from
his April 2008 notes, but added that she had a "recent increase in craving for alcohol." (TR
1929.) The notes are ambiguous as to her GAF on this date: in various locations it is listed as
"50-45-50" and 49. (TR 1924, 1929-30.) The next day Hamlin met with Mr. Jolin, who stated
that the Wellbutrin and Celexa seemed to be "working well," that Hamlin was feeling less
depressed, and that she was "having more good days than bad days." (TR 1923.) Hamlin was
under a lot of stress due to her work and an ongoing breakup with her boyfriend; however, she
resisted urges to drink. *Id.*

Hamlin met with Nurse Tokarz on April 22, 2009. (TR 1920.) Her mother had passed
away after being in a coma for four years, but she was able to avoid drinking in response. (TR
1920-21.) Hamlin was still working and stated she "love[d]" it, was active in AA, and was taking
college courses. (TR 1922.) On May 22, 2009, Hamlin met with Mr. Jolin. (TR 1915.) Her
boyfriend had moved in, she was back at work after taking leave for her mother's death, and her
mood was "up and down" because she was grieving for her mother. (TR 1915-16.) On June 3,
2009, Hamlin saw Nurse Tokarz. Despite receiving an incomplete in one college course, she had
"some good and bad days," showed a "brighter – smiling, calm" affect, and appeared less
depressed. (TR 1913-14.)

Hamlin returned to Dr. Dmochowski on July 6, 2009. (TR 1908.) Her work was
"emotionally fatiguing." (TR 1909.) Dr. Dmochowski wrote, as he did in November 2008, that
she was "more subdued and depressed and anxious than she was last visit," copied text from his

initial notes from April 2008, and assigned a GAF of "50-45-50" and 50. (TR 1911-12.) On August 26, 2009, Hamlin met with Nurse Tokarz, who noted that Hamlin was compliant with medications, that she had bought a car with the money she saved from not purchasing alcohol, and that her depression was "improving." (TR 1902-03.)

On October 2, 2009, Hamlin had an initial visit with psychiatrist Timothy Rivinus. (TR 1899.) Dr. Rivinus diagnosed major depressive episode with melancholia and ADHD, adult residual type. (TR 12, 15, 1901.) The note is unclear what GAF he assigned; in one location it is "50-45-50" and in another 60.[7] (TR 1901-02.) Hamlin was taking English and Algebra at BCC and working 24 hours per week. (TR 12, 15, 1899.) On November 4, 2009, Hamlin saw Nurse Tokarz and stated that she was feeling less depressed and "most days are good;" she reported full medication compliance and was sleeping better on doxepin. (TR 15, 1887-88.) However, she was feeling a lot of stress, was "snapping [a lot] at people," and had to drop her algebra class. (TR 1888.) On November 6, 2009, Hamlin met with Mr. Jolin, who wrote that Hamlin had to withdraw from math class because of irritability and that "the least little thing irritates her… She snaps at people as she is miserable but she doesn't know why. She use[d] to love her job but she doesn't feel that way now." (TR 1886.) Hamlin was maintaining sobriety and attending AA meetings; she had stopped some of her medications but planned to resume. *Id.*

On November 18, 2009, Hamlin had an unscheduled emergency visit with Nurse Tokarz, saying that she felt increasingly depressed, had stopped attending work on November 9, and had been staying at home alone in her bedroom. (TR 1884.) Nurse Tokarz noted that Hamlin was "under severe emotional distress at this time and will need to be evaluated by her psychiatrist before starting back to work." (TR 1885.) Dr. Rivinus met with Hamlin the next day. (TR 1880.)

---

[7] A GAF score of 51 – 60 indicates "moderate difficulty in social, occupational, or school functioning." (TR 15 (citing *DSM-IV* (1994)).)

Hamlin told him she was "isolating," and "thinking about my [deceased] mother [a lot]. I think I may have taken on too much." (TR 1880.) Dr. Rivinus assigned a GAF of 45. (TR 1883.)

Hamlin followed up with Nurse Tokarz on December 30, 2009. (TR 16, 1874.) Hamlin was taking her medications and reported that "things are getting better" and her relationship with her boyfriend was going well. (TR 1874.) However, she was on a three-month medical leave from work; she reported irritability and anger. (TR 16, 1874-75.) Nurse Tokarz wrote that Hamlin looked "quite sad," but Hamlin denied depression or anxiety. (TR 1874.) Hamlin next saw Dr. Rivinus on January 21, 2010. (TR 16, 1866.) Hamlin stated "I want to feel myself again like I was feeling last summer [2009]. I'm just dragging." (TR 1867.) Her energy was "still poor" and she stayed in bed; she experienced anhedonia and guilt. *Id.* As before, Dr. Rivinus' notes contain some identical text to previous notes. (TR 16, 1867.) He assigned GAF of 50. (TR 16, 1869.) On January 26, 2010, Hamlin saw Mr. Jolin. (TR 1866.) Confusingly, his notes state "She doesn't know what triggered her alcohol relapse" and "She has been sober for the past two years. She hasn't had the urge to drink." (TR 16, 1866.) There is no further discussion of this fleeting reference to relapse. Hamlin had not returned to work and had taken an incomplete in her BCC course. (TR 1866.)

On February 8, 2010, Hamlin saw Dr. Than Than Win at the Greater New Bedford Community Health Center. (TR 16, 381, 777.) Hamlin requested a psych referral for depression and anxiety, stating that she used to take Celexa and Wellbutrin but stopped over one year ago because she ran out of medication. (TR 16, 381, 777.) The records do not show that Hamlin actually followed up on this request for referral. On December 14, 2011, Hamlin reported to Dr. Win that she had previous issues with alcohol, but had been sober since January 10, 2008. (TR 766.)

On March 9, 2010, Hamlin returned to Dr. Rivinus, stating that the one-year anniversary of her mother's death was approaching and causing her stress. (TR 16-17, 1860.) Dr. Rivinus' notes contain some identical text from the January 21 visit, but he noted that she "actually seems less [depressed]." (TR 17, 1861.) He assigned a GAF of 60. (TR 1863.) Hamlin had an initial visit with registered nurse Paul Cobb on March 11, 2010, and reported "doing fairly well related to depression, grief and abstaining from alcohol." (TR 1858, 1860.) Hamlin saw Mr. Jolin on March 24, 2010, noting that she "feels better physically and emotionally." (TR 17, 1857.) Her family leave from work had expired, but she felt that working in a detox facility was not helpful to her own recovery. (TR 17, 1857.) She intended to follow up on the incomplete in her BCC course. (TR 1857.) On April 12, 2010, Hamlin again saw Nurse Cobb, reporting that she had gone to the emergency room the Friday before, seeking help for "severe anxiety – shaking, sweating, crying, irritability, jittery." (TR 1854.)

On May 11, 2010, Hamlin followed up with Dr. Rivinus. (TR 17, 1849.) Hamlin stated she was "still stressing… I wish I was more energy. I'm still not right." (TR 1849.) She was in her 28th month of recovery. (TR 1850.) Dr. Rivinus assigned a GAF of 60. (TR 17, 1852.) On May 24, 2010, Hamlin saw Nurse Cobb and reported that her depression was up and down, but her "life is together, peaceful." (TR 17-18, 1846.) She was attending AA meetings weekly and hanging out with her neighbor, and her husband[8] was sober for over a year. (TR 1846.) During this visit, Dr. Rivinus changed her medication from Buspar to Gabapentin. (TR 1847.) On June 11, 2010, Hamlin met with Mr. Jolin. (TR 18, 540, 1845.) She disclosed that she had recently learned of her partner's criminal record and that they had to move because of it. (TR 540, 1845.) Gabapentin and Wellbutrin were working well, and Ambien helped her sleep. (TR 540, 1845.)

---

[8] The records refer to Hamlin's partner alternately as her "boyfriend" and as her "husband."

She finished her Associate's degree at BCC. (TR 540, 1845.) Hamlin "remained clean and

sober" and "seem[ed] to [be] slowly coming out of her depression." (TR 540, 1845.)

On July 16, 2010, Hamlin saw Dr. Rivinus, stressed over a recent move. (TR 18, 1834.)

Dr. Rivinus' notes repeat the same language "I wish I was more energy. I'm still not right." (TR

1835.) He again assigned a GAF of 60. (TR 18, 1838.) On July 26, 2010, Hamlin met with Mr.

Jolin and discussed her deteriorating relationship with her partner; she was concerned that he

would relapse into drinking. (TR 18, 1831.) On August 9, 2010, Hamlin met with Nurse Cobb,

saying that she was "experiencing increased stressors," feeling "a little more depressed," with

slowed thought and difficulty concentrating. (TR 1827.) She was enrolled in a criminal justice

course at BCC, having intermittent crying spells, and experiencing anxiety around signing the

lease for her new apartment with her husband. *Id.* She was doing "OK" on the Wellbutrin but

admitted feeling situationally more depressed. *Id.*

On August 27, 2010, Hamlin told Dr. Rivinus, "[I feel] like nothing to look forward to."

(TR 1819.) He copied identical text from his previous notes and assigned GAF of 60. (TR 1822-

23.) Hamlin saw Nurse Cobb on September 20, 2010. (TR 1814.) Although Hamlin was tearful

about the anniversary of her sister's death, she had a positive volunteering experience and stated

"I'm doing better. I feel well, I want to volunteer, give back something… It's the best I've felt in

a long time." (TR 18, 1814.) She was taking Bupropion, Zolpidem, and Gabapentin. (TR 1815.)

Hamlin had been sober for nearly three years and was attending AA meetings once every two

weeks. *Id.*

On October 7, 2010, Hamlin met with Dr. Rivinus, reporting "I feel better. I haven't been

stressing. I'm taking care of myself." (TR 1806-07.) He again assigned a GAF of 60. (TR 1811-

12.) Hamlin saw Mr. Jolin on November 29, 2010, and disclosed that she filed for divorce and

obtained a restraining order against her husband, who had been hiding his criminal record and possible drug use. (TR 1805.) She had "been feeling more depressed lately" and increased Wellbutrin, but maintained sobriety. *Id.* On December 27, 2010, Hamlin met with Ms. Keel and reported that she was continuing her criminal justice classes and felt generally well, although she was "under stress." (TR 675, 1792.) The next day Hamlin told Nurse Cobb "I'm hanging [in] there." (TR 672, 1789.) She had to have the police remove her husband from her apartment; she was convinced he would violate the restraining order and said "I watch my back." (TR 672, 1789.) She disclosed that her husband had been abusive. (TR 672, 1789.) Hamlin was nearing three years of sobriety and "report[ed] her sobriety is safe despite increased stress." (TR 672, 1789.) Her mood was fair and her affect depressed at times. (TR 672, 1789.)

On January 3, 2011, Hamlin saw Dr. Rivinus. (TR 663, 1781.) Although she experienced urges to drink over the holidays, she intended to meet her three-year sobriety goal. (TR 664, 1781.) The rest of Dr. Rivinus' notes are exact copies of previous notes, including the GAF score of 60. (TR 19, 664-67, 1781-88.) Hamlin met with Mr. Jolin on January 10, 2011. (TR 662, 1779.) Her husband continued to cause her stress and try to get her to relapse, but she planned to take the next steps in obtaining a divorce. (TR 662, 1779.) Hamlin was feeling "more angry than depressed" and "less stressed since her husband isn't living with her." (TR 662, 1779.) On January 24, 2011, she met with Nurse Cobb, and stated that she felt less threatened by her husband. (TR 19, 656, 1774.) She reported depression as "6/10 with 10 worst," anxiety "OK," and sleep variable. (TR 19, 657, 1774.) Hamlin was taking Zolpidem and Bupropion. (TR 657, 1774.)

Hamlin met with Dr. Rivinus on February 25, 2011, and reported that her divorce would be final in July 2011 and that she was looking forward to an internship in a family court office.

11

(TR 19, 649-50, 1767.) The notes contain the same text, including the GAF of 60. (TR 650-53, 1767-1770.) She met with Nurse Cobb on April 4, 2011, and her moods were "stable overall," although she stated "I think I could be happier." (TR 644, 1676.) She was taking Bupropion, Zolpidem, and Gabapentin. (TR 644, 1676.) Hamlin returned to Nurse Cobb on May 16, 2011, depressed and upset about her ex-husband's harassment. (TR 639-640, 1673.) Her depression was worse, with crying spells, and the stress was making her physically ill and nauseous. (TR 640, 1673.) She continued taking Wellbutrin and Gabapentin. (TR 640, 1673.) Nurse Cobb noted her attitude was "stressed, anxious," her affect was "depressed," and her mood was "poor, puts on a happy face." (TR 640, 1673.)

Hamlin returned to Dr. Rivinus on June 6, 2011. (TR 20, 624, 1659.) His notes contain identical text to previous notes, including the GAF of 60, but he mentioned that Hamlin's ex-husband was still harassing her and that she had 3.4 years of sobriety. (TR 20, 625, 627-28, 631, 1660, 1662.) On June 9, 2011, Hamlin saw Mr. Jolin. (TR 20, 623, 1658.) Her ex-husband had violated his restraining order by coming to her house. (TR 623, 1658.) She had withdrawn from a friend who relapsed on alcohol, but became closer to her sister. (TR 623, 1658.) Hamlin returned to Mr. Jolin on July 7, 2011, relating that her husband attacked her car with an ax and threatened to hurt her. (TR 20, 622, 1657.) She also reported increased urges to drink. (TR 622, 1657.)

On July 11, 2011, Hamlin saw Nurse Cobb. (TR 20, 618, 1653.) Her ex-husband was in jail, but she was still very upset: "I'm really struggling right now" with urges to drink. (TR 619, 1654.) She reported feeling distracted and forgetful, sitting in her home with the lights off and the window shut worrying that her husband would send someone to hurt her. (TR 20, 619, 1654.) She continued taking Wellbutrin and Zolpidem. (TR 619, 1654.) Also on July 11, 2011, Hamlin attended a session of group therapy for substance abuse. (TR 617, 1652.)

12

On her Function Report completed July 11, 2011, Hamlin described her day as "Constantly sit in thoughts of emotional distress. Pace, in dark rooms, lights out, try to think but thoughts are scrambled. Eat soup, unable to focus, wash, stay in bedroom. Loner, walk." (TR 299.) She stated that she went out to feed and walk her dogs, buy food at the store, and go to medical appointments. (TR 301.) On November 23, 2011, Hamlin completed a second Function Report in which she described similar life circumstances. (TR 325.)

Hamlin saw Mr. Jolin on July 28, 2011, reporting the death of two friends from cancer and upcoming court dates for the damage her husband did to her car. (TR 20, 605-06, 1651.) She returned to Mr. Jolin on September 1, 2011, noting that she had been sick daily, had "no energy," and had felt "awful for the past three weeks." (TR 21, 605, 1650.) Her friends were meeting at places where she would be tempted to drink. (TR 21, 605, 1650.)

On September 19, 2011, Hamlin saw Nurse Cobb, "very stressed and more depressed," her divorce was not yet finalized, and she had not been going to AA much. (TR 599-600, 1645-46.) She stayed in bed most of the day unless she had appointments, and had no other activity besides walking her dogs. (TR 600, 1646.) Hamlin requested an increase in Wellbutrin; her affect was "depressed" and her mood "poor." (TR 600-01, 1646.) On October 27, 2011, she met with Mr. Jolin, reporting increased anxiety and depression; she had woken up crying and was angry about having to stay away from friends who drink. (TR 21, 592, 1638.) She had been sober for nearly four years and got out of the house to walk her dogs. (TR 592, 1638.) The next day she told Dr. Rivinus that she had to give up friends who drank, and missed her ex-husband. (TR 583, 1629.) The rest of Dr. Rivinus' note contains the repeated text and GAF of 60. (TR 21, 587-91, 1629-34.)

She saw Nurse Cobb on December 12, 2011. (TR 574, 1621.) Although she continued taking the increased dose of Wellbutrin, she felt more depressed, had some thoughts that life is not worth living, and rated her depression 9/10 overall with 10 worst. (TR 575, 1621.) She had powerful urges to drink and had not attended AA in a few weeks; her affect was "depressed" and her mood "poor." (TR 575, 1621.) On the same date Hamlin met with Dr. Rivinus, who added Zoloft to her medications. (TR 577, 1621.)

### c. Relapse into Alcohol Use: December 2011 through July 2013

The records show that Hamlin used alcohol at least sporadically from December 2011 through July 2013. On February 2, 2012, Hamlin saw Nurse Cobb for the first time that year. (TR 1610.) She reported a relapse in December 2011 that lasted until January 26, 2012, when she detoxed at home. (TR 21-22, 1610.) During the relapse, she had some blackouts and could not remember details. (TR 1610.) She stated that she had missed her medications while drinking, but was back on them fully. (TR 21-22; 1611.) On March 3, 2012, Hamlin saw Nurse Cobb and admitted drinking off and on. (TR 1602.) Her tolerance was lower than before, but she was still experiencing blackouts when drinking and physical withdrawal symptoms when she did not drink. *Id.* She noted that she was able to stay sober throughout many stressful events, but relapsed when the stressors dissipated. *Id.* She was not taking medication as prescribed. *Id.* She agreed to go to detox after one week. *Id.*

On March 27, 2012, Hamlin had an initial visit with psychologist Phillip Dingmann. (TR 22, 1594.) She admitted drinking "at least every other day, but not as much as I used to." (TR 1596.) She agreed to enter detox, but wanted to first "get things in order at home with my bills & stuff." (TR 1597.) Her depression was 8 on a scale of 10, and compliant with all medications except Ambien, because of potential side effects with alcohol. *Id.* Her attention and

concentration were "poor," speech "slow," mood "goes minute to minute" but "better in the mornings," and affect was "nervous, mildly tearful, yet able to smile." (TR 1599.) Dr. Dingmann assigned a GAF of 45-50. (TR 1599.) The record does not show that Hamlin actually entered a formal detox program at this time, or that she ever had another appointment with Dr. Dingmann.

On May 15, 2012, Hamlin saw Ms. Keel and reported detoxing at home with the help of a friend for nine days beginning April 14, 2012. (TR 1590.) During her recent relapse she was drinking "more than one pint of vodka daily." *Id.* On June 8, 2012, Hamlin saw Dr. Rivinus. (TR 1582.) Dr. Rivinus' notes contain identical text to previous notes, stating that she has "28 months of recovery from alcoholism" dating from "Jan. of 2008." (TR 1582.) Hamlin reported getting services from Adcare in Dartmouth and Clean Slate. (TR 1583.) Dr. Rivinus noted that Hamlin was "overwhelmed looking," "not well-washed and oderous." (TR 1584.) He again rated her GAF as 60. (TR 1585-86.)

In June 2012, Hamlin began regular attendance at group therapy for substance abuse treatment.[9] (TR 1573-80.) To participate in the group, Hamlin had to pass a breathalyzer test. *See id.* Hamlin saw Dr. Rivinus on August 10, 2012. (TR 1565.) Hamlin discontinued Vivitrol and asked for naltrexone to avoid drinking. (TR 1566.) She was attending AA and sobriety groups regularly. (TR 1566-67.) On August 23, 2012, Hamlin saw Nurse Cobb; she had stopped attending meetings as regularly, and avoided leaving her home in the afternoon as it triggered her

---

[9] She attended on July 11, 2011; in 2012 on June 11, June 18, July 2, July 9, July 30, September 17, September 24, October 15, October 22, November 19, December 3, December 10, December 20, and December 31; and in 2013 on January 7, January 14, January 28, February 4, March 4, March 11, March 21, March 28, April 4, April 18, May 2, May 9, May 16, May 23, June 6, June 13, June 20, June 27, July 25, August 1, August 22, and August 29. (TR 787-89, 793-95, 798-99, 813-16, 820-21, 824-26, 831-32, 838-40, 858-6, 862-65, 869-71, 890-91, 893-96, 1100-01, 1109-11, 1125-27, 1130-31, 1146-47, 1151-53, 1220-21, 1224-26, 1230-31, 1236-37, 1251-52, 1258-59, 1263-64, 1487-89, 1493-96, 1500-02, 1522-23, 1530-31, 1537-38, 1558-61, 1573-80, 1652, 1705-10, 1731, 1736-37, 1741-42, 1748-50, 1752-55, 2023-27, 2044-45, 2047-48, 2050-53, 2059-61, 2065-67.)

alcohol cravings. (TR 1561.) Hamlin reported feeling more anxious than depressed, and mentioned concern about the "newness of sobriety." (TR 1561-62.) Her affect was "mildly depressed," and her mood fair. (TR 1562.)

On October 12, 2012, Hamlin saw Dr. Rivinus and reported that she couldn't sleep and was having traumatic dreams and flashbacks at night. (TR 22, 896, 1543-44.) Hamlin disclosed a history of incest for the first time. (TR 1545.) Her appearance was "overwhelmed, [weeping], confessional," Dr. Rivinus noted that Hamlin "relapsed several times" since her initial sobriety in January 2008, and "has several months of sobriety as of Oct 2012." (TR 880-81, 1552.) He rated her GAF as 50. (TR 882, 1539, 1546.) On November 8, 2012, Hamlin met with Mr. Jolin. (TR 22, 1525.) "Despite being on meds she still felt like crap and all she wanted to do was to sleep." (TR 1525.) Hamlin had insomnia and went on a three-day alcohol binge; she "really didn't want to drink" but felt she had to in order to get some sleep. (TR 1525-26.)

On November 19, 2012, Hamlin had an initial appointment with psychologist Uma Subbiah at the New Bedford VA Outpatient Clinic. (TR 892, 1593.) Hamlin disclosed her childhood abuse, and Dr. Subbiah noted that memories of the abuse "affects her sleep, tends to avoid social contact and resists relationships." (TR 1524.) Her mood was "okay" and her affect was "depressed, tearful." *Id.* Hamlin reported sobriety since November 1. *Id.* Dr. Subbiah diagnosed Hamlin with PTSD, major depressive disorder, insomnia, panic disorder, GAD, alcohol dependence in early remission, and ADHD, and rated her GAF as 50. (TR 893, 1524.)

On November 29, 2012, Hamlin met with Nurse Cobb, who wrote that she was "[s]taying sober; last drank beginning of November; drank for three days. She drank because she wanted to sleep; and did." (TR 887, 1519.) Hamlin was feeling anxious and having racing thoughts. (TR 888, 1519.) On November 30, 2012, Hamlin met with Nurse Cobb and told him she felt "anxious

and depressed," but was "attending group and staying sober." (TR 841, 865.) She noted that she had a relapse to alcohol in "Dec/Jan 2012." (TR 865.) On November 30, 2012, Hamlin saw Dr. Rivinus and reported "[n]o drinking. Sober over Thanksgiving." (TR 872, 1503.) She was struggling with "dreams, nightmares flashbacks." (TR 872, 1503.) This note also contains identical text to previous notes; Dr. Rivinus rated her GAF as 50 in two locations and 60 in another. (TR 874, 876, 880, 1505, 1507, 1511.)

On December 20, 2012, Hamlin met with Nurse Cobb feeling "anxious and depressed" after a poor night's sleep. (TR 1496.) Her mood was "fair to poor" and her affect was "depressed, tired." (TR 1497.) On January 15, 2013, Hamlin met with Dr. Subbiah and said her mood was "up and down," that she was having "difficulties managing social situations due to lack of assertiveness and feeling easily overwhelmed." (TR 23, 842, 861, 1491.) Hamlin reported that she was remaining sober, although she was thinking about drinking. (TR 861, 1492.) Her mood was "okay" and her affect depressed and tearful. (TR 23, 861, 1492.) Dr. Subbiah gave her a GAF score of 50. (TR 861, 1492.)

On January 28, 2013, Hamlin saw Mr. Jolin and said she "gets [panicky] when she is out in public. She doesn't have any desire to drink alcohol in the morning. If she leaves the house in the afternoon she would get a strong desire to stop at a package store. … Her neighbor, Kevin, relapsed so she can't be around him now… She has been isolating and this feeds into her depression." (TR 842, 1490.) On March 4, 2013, Hamlin met with Dr. Rivinus in an "anxiety state," nervous about an upcoming colonoscopy. (TR 843, 1757.) He rated her GAF as 50 in one location and 60 in another. (TR 845, 847, 1480, 1760-61.) Her insomnia had intensified, and she was having intrusive PTSD symptoms. (TR 23, 1760.) Again, Dr. Rivinus' note contained identical text to previous notes.

At her March 11, 2013 group therapy session, Hamlin told the facilitator that she had a new prescription for clonazepam and had a recent relapse to "1/2 can of beer." (TR 840, 1744.) On March 18, 2013, Hamlin saw Dr. Subbiah, reporting that she started clonazepam and "has found it helpful in reducing her anxiety symptoms, 'feel calm,' not losing temper as easily." (TR 23, 837, 1751.) Dr. Subbiah assessed her GAF as 50. (TR 838, 1752.) On March 25, 2013, Hamlin saw Nurse Cobb, who noted she was "agitated due to a frustrating experience at City Hall." (TR 1743.) She was taking Klonopin and Gabapentin HS, which was helping her sleep. (TR 1743-44.) On April 2, 2013, Mr. Jolin wrote "Lately, [Hamlin] states that she has been very agitated… she continues to isolate too much. Her mind is constantly racing and she is also double checking things. She is in her comfort zone when she is home in bed." (TR 802.) She reported having no urges to drink "since she was placed on clonazepam." (TR 23, 803.)

On April 4, 2013, Hamlin spoke to Nurse Cobb on the phone and told him she drank "a pint" of alcohol. (TR 23, 802, 830, 1150, 1263.) On April 8, 2013, Hamlin spoke with her group therapy facilitator on the phone and told him she did not drink after her lapse on April 4. (TR 829, 1149, 1262.) On April 17, 2013, Dr. Subbiah wrote that Hamlin reported "relapsing [on alcohol] 2 weeks ago after returning from her SATP group in Providence" on a pint of vodka, but that she had not continued to drink after that day. (TR 23, 803, 827-28, 1147-48, 1259-60.) Dr. Subbiah assigned GAF of 50. (TR 1148, 1261.)

On May 2, 2013, Hamlin went to the emergency department because of right shoulder pain, "[adamantly] requesting pain meds." (TR 1136.) When told she could not have narcotic medications because of her naloxone prescription, Hamlin became "very upset" and left. *Id.* She followed up the same day with Ms. Keel, who noted Hamlin "has been increasingly anxious over

the last few weeks."[10] (TR 1127.) Ms. Keel informed Hamlin that she should avoid opiate medication, instead increasing her Gabapentin prescription, and Hamlin was "in agreement with this plan." (TR 1129.) On May 20, 2013, Hamlin saw Dr. Rivinus. (TR 23, 1112, 1239.) She reported staying in bed late in the morning, having dreams, nightmares and flashbacks. (TR 1114-15, 1241.) Dr. Rivinus maintained the same diagnoses and assigned a GAF of 50 in two notes and 60 in another. (TR 23, 1117, 1119, 1123, 1244, 1245, 1249.) On May 30, 2013, Hamlin saw Dr. Subbiah; she reported "relapsing on alcohol for one day 2 weeks ago [her mother's birthday] but no use since that time." (TR 796, 1237-38.) Dr. Subbiah diagnosed Hamlin with PTSD, major depressive disorder, insomnia, panic disorder, GAD, alcohol dependence "early remission," and ADHD, and assigned a GAF of 50. (TR 797, 1238.) Hamlin's mood was good with anxious affect. (TR 23, 796, 1237.)

On June 17, 2013, a "very depressed" and tearful Hamlin saw Nurse Cobb. (TR 24, 1105, 1226, 2068.) She reported sobriety since April after her December-January 2012 relapse. (TR 24, 1106, 1227, 2069.) On July 2, 2013, Hamlin saw Dr. Subbiah. (TR 24, 1099, 1216, 2057.) Hamlin felt more depressed after difficulties with her brother, and experienced more disturbing memories of childhood abuse. (TR 24; 1099, 1216-17, 2057.) Dr. Subbiah's notes contain identical text to May 30, when Hamlin mentioned a relapse on her mother's birthday. (TR 24; 1100, 1217, 2058.) Dr. Subbiah assigned a GAF of 50. (TR 1100, 1218, 2058.)

### d. Inpatient Alcohol Rehabilitation: July 2013

On July 15, 2013, Hamlin called Dr. Rivinus, weeping and "maudlin" with slurred speech. (TR 25, 1097, 1215.) She was being evicted because of her drinking, and was admitted

---

[10] The ALJ interprets this as "some drug seeking behavior." (TR 28.) However, there is no other evidence in the record that Hamlin was abusing narcotic medications, and narcotic abuse is not among the ALJ's findings.

to rehab. (TR 25, 1097, 1215.) At intake to the VA Boston Healthcare System, she admitted not

taking medications while she was drinking, "for a long time." (TR 25, 1461.) Psychiatry resident

Dr. Simrun Kalra diagnosed alcohol dependence, substance-induced mood disorder, major

depressive disorder, and ruled out mood disorder and dysthymia; and assigned GAF of 30.[11] (TR

1464.) Hamlin described PTSD symptoms but refused to elaborate and became tearful. *Id.*

Hamlin admitted relapsing in 2011, initially drinking a pint of vodka and increasing to a half-

gallon per day. (TR 25; 1423, 1465.) Her mother's death triggered her depression, and PTSD

related to childhood abuse resulted in nightmares and flashbacks. (TR 25, 1424.) Psychiatry

resident Dr. Hadi Estakhri at the Brockton VA diagnosed Hamlin with alcohol dependence and

depressive disorder, ruling out substance-induced mood disorder, major depressive disorder, and

PTSD; and assigned GAF of 30. (TR 25, 1428.) Hamlin met with social worker Lauren Fleury

and described PTSD symptoms but "did not wish to elaborate." (TR 1420.) On July 16, 2013,

Dr. Rivinus spoke with Dr. Estakhri and noted that Hamlin was "reluctant, [although] chronically

depressed, to start antidepressant" and stated that Hamlin used alcohol to escape her traumatic

memories rather than confronting them with Dr. Subbiah. (TR 1097.)

Dr. Olga Osokina met with Hamlin on July 17, 2013 and noted that Hamlin "isolates

herself on the unit, states she feels anxious around others." (TR 1391.) Dr. Osokina diagnosed

alcohol dependence, depressive disorder, and PTSD, and ruled out substance-induced mood

disorder; she assigned GAF of 40. (TR 1392.) On July 18 and 19, 2013, Dr. Estakhri diagnosed

Hamlin with alcohol dependence with rule-outs of PTSD, substance-induced mood disorder, and

major depressive disorder, and assigned GAF of 30. (TR 1374, 1352.) On July 22, 2013, Dr.

---

[11] A GAF score of 21 – 30 indicates "the presence of hallucination or delusions which influence behavior, a serious impairment in the ability to communicate with others, a serious impairment in judgment or the inability to function in almost all areas." (TR 25 (citing *DSM-IV* (1994)).)

Osokina and Dr. Estakhri assigned GAF of 50 in one note and 60 in several others. (TR 1294, 1303, 1314, 1328.)

Hamlin was discharged on July 22, 2013; discharge diagnoses were alcohol dependence with rule-outs of PTSD, substance-induced mood disorder, and major depressive disorder. (TR 25, 1294, 1314, 1303.) Despite these rule-outs, Dr. Estakhri prescribed sertraline for PTSD and depressive symptoms, "depressive disorder NOS" was listed under "psychological problems and psychiatric issues," and Hamlin's treatment plan included treatment for depressive and PTSD symptoms in addition to substance abuse. (TR 1300, 1311, 1319-21.)  She declined to enter a residential program, opting instead to return home to care for her dog and maintain her eligibility for veteran's disability benefits. (TR 25, 1300, 1311, 1319-21.)

### e. Outpatient Treatment and Sobriety: July 2013 through end of records

On July 23, 2013, Dr. Rivinus and Nurse Cobb met with Hamlin. (TR 25; 1210, 1737, 2053.) Nurse Cobb reviewed Hamlin's prescriptions of Naltrexone, Trazodone, Sertraline, and discontinued Wellbutrin. (TR 1210, 1737, 2053.) Hamlin tried to attend an AA meeting, but had to stay "by the door due to anxiety." (TR 1210, 1737, 2053.) She was being evicted from her apartment. (TR 1210, 1737-38, 2053.) On July 31, 2013, Hamlin met with Dr. Subbiah and discussed her recovery and group attendance. (TR 1733, 2049.) Hamlin reported "significant depressive symptoms and admits to isolating at home and often staying in bed." (TR 1733, 2049.) Dr. Subbiah assigned a GAF of 50. (TR 1734, 2050.)

On August 14, 2013, Hamlin saw Nurse Cobb and reported staying home, being "very depressed," and having nightmares; her mood was poor and her affect depressed and anxious. (TR 25, 1722-23, 2040-41.) On August 20, 2013, Dr. Rivinus wrote that Hamlin was resuming Bupropion and attending groups. (TR 1713, 2031.) She stated "I'm still depressed even [though]

I'm not drinking." (TR 1713, 2031.) Dr. Rivinus' note again contained identical text and parallel GAF scores of 50 and 60. (TR 1716, 1718, 2034, 2036.) On September 6, 2013, Hamlin returned to Nurse Cobb, "present[ing] more chipper and well dressed/groomed." (TR 1701, 2019.) Wellbutrin was helping, and she felt better "but I still have my moments, I'm still struggling." (TR 1701, 2019.) Hamlin had reconciled with her landlord and was no longer being evicted. (TR 1701, 2019.)

On September 18, 2013, Hamlin saw Dr. Subbiah, who noted that Hamlin was staying sober and attending groups, but was still "isolating in apartment and often staying in bed during the day." (TR 1693-94, 2017.) Dr. Subbiah assigned GAF of 50. (TR 1694, 2017.) On October 1, 2013, Hamlin saw Nurse Cobb and reported she was "staying sober, no [alcohol] in her apartment, taking the Naltrexone." (TR 1689, 2012.) Her affect was "moderately depressed and anxious" and her mood "fair." (TR 1689, 2013.)

On October 16, 2013, Hamlin saw Dr. Subbiah and reported "I have been crying a lot lately… just existing." (TR 1680, 2005.) She reported vivid violent nightmares, significantly worse depressive symptoms, and a lack of motivation and energy. (TR 1680, 2005.) Group therapy was overwhelming and she was unable to attend. (TR 1680, 2005.) Dr. Subbiah assigned GAF of 45. (TR 1681, 2005.) On October 31, 2013, Hamlin saw Mr. Jolin, who wrote that she "remain[ed] depressed with no motivation or desire to do much of anything… The patient continues to have a depressed mood that she is unable to shake." (TR 1678.) Hamlin also noted that her previous alcohol abuse had been an attempt to cope with her emotional pain and trauma. *Id.*

**2. Medical Opinions**

On August 24, 2011, Dr. John Garrison, the state agency psychological consultant on initial consideration, evaluated Hamlin's condition and residual functional capacity ("RFC")[9] based on the medical records, finding her not disabled. (TR 21, 98-105.) Dr. Garrison reported that Hamlin had primary impairment of affective disorder, with a secondary impairment of "alcohol, substance addiction disorders." (TR 102.) He found these impairments not severe, noting that "Claimant appears to be responding well to treatment… sober for some time now and depression in partial remission… coping with situational stressors and grief over death of mother in 2009." (TR 101; ellipses in original.) Dr. Garrison credited Hamlin's allegations of alcoholism, but found the allegations of bipolar disorder and severe depression "partially credible, are not fully supported as the claimant is in partial remission." (TR 101, 103.) He stated that Hamlin had no restriction in daily living activities; mild difficulties in maintaining social functioning and maintaining concentration, persistence or pace; and insufficient evidence of decompensation. (TR 102.)

On January 9, 2012, psychologist Dr. Steven Fischer, the state agency psychological consultant on reconsideration, reviewed Hamlin's medical records. (TR 21, 106-117.) He likewise found Hamlin not disabled. (TR 117.) He opined that the primary diagnosis of affective disorders was severe, while alcohol addiction was non-severe. (TR 111.) He stated that Hamlin had no restriction in daily living activities; mild difficulties in maintaining social functioning; moderate restrictions in maintaining concentration, persistence or pace; and insufficient evidence of decompensation. *Id.* Like Dr. Garrison, Dr. Fischer credited Hamlin's allegations of

---

[9] A Social Security claimant's residual functional capacity is "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular continuing basis," despite mental and physical limitations. SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996); *see* 20 C.F.R. §§ 416.920(e), 416.945, 404.1545(a)(1).

alcoholism, but found the allegations of bipolar disorder and severe depression partially credible. (TR 112.) Dr. Fischer opined that Hamlin had no understanding or memory limitations, and no social interaction limitations. (TR 113.) He stated that she had no significant limitations in sustaining an ordinary routine, working in coordination with or in proximity to others, or making simple work-related decisions. *Id.* He found moderate limitations in carrying out detailed instructions; maintaining attention and concentration; maintaining a schedule, attendance, and punctuality; completing a normal workday and workweek without interruptions; and performing at a consistent pace without unreasonable breaks. *Id.* He believed Hamlin was restricted to simple work. (TR 115.)

On January 27, 2012, state agency consultant Dr. Michelle Hoy-Watkins, psychologist, completed a case analysis, RFC assessment, and Psychiatric Review Technique form ("PRTF") based on her review of the medical record. (TR 686-90.) Dr. Hoy-Watkins agreed with Dr. Fischer's January 9, 2012 assessment, finding that Hamlin's "attention, concentration, and memory were within normal limits" and "ADLs are adequate." (TR 690.) She found Hamlin's alcohol use "not material" because her assessment denied disability and because "claimant is in recovery from her alcohol use and is involved in an AA recovery program." *Id.* She found that Hamlin's "symptoms are not prominent and do not markedly [limit] her functional abilities." *Id.* She found Hamlin capable of complying with simple instructions, and having appropriate social interactions for work. *Id.* Hamlin had a moderate limitation in her "ability to handle work related stressors and changes in routine." *Id.*

On June 3, 2013, Nurse Cobb wrote an opinion. (TR 24, 1090-91.) He diagnosed Hamlin with PTSD, major depressive disorder, insomnia, panic disorder, GAD, alcohol dependence in partial early remission and ADHD. (TR 24, 1091.) He noted marked limitations on Hamlin's

ability to remember locations and work procedures; to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration sufficient for an eight hour work day; to keep a schedule, maintain attendance, and be punctual; to sustain an ordinary routine without supervision; to work in coordination with or in proximity to others; to complete a normal work day and work week without interruptions, and maintain pace; to interact appropriately with the public; to accept instructions and criticism; to get along with coworkers and peers; to respond to changes in the work setting; to travel in unfamiliar places or use public transportation; and to set realistic goals or make independent plans. (TR 1090-91.)

On June 25, 2013, Dr. Rivinus completed a "disability assessment" at the request of Hamlin's attorney. (TR 24, 1092-96, 1101, 1222, 2062.) He gave diagnoses of PTSD, major depressive disorder, insomnia, panic disorder, GAD, alcohol dependence in early remission, and ADHD, with a GAF of 60. (TR 24, 1092-93, 1102, 1222, 2062.) Dr. Rivinus opined that Hamlin had "occupational and social impairment with deficiencies in most areas, such as work, school, family relations, judgment, thinking and/or mood." (TR 1096, 1104, 1224, 2064.) He stated that Hamlin had extremely severe difficulties in understanding complex directions, being reliable, being anxious/panicky/fearful, and being paranoid/on guard. (TR 1093-95, 1103-04, 1223, 2063-64.) He wrote that Hamlin had severe difficulties in thinking clearly under pressure, concentration and memory, solving problems, working on tasks, working with others, and getting along with others. (TR 1093-95, 1103-04, 1222-23, 2063-64.) He described Hamlin as having "mental confusion," "panic reactions under stress," "flashbacks," "fatigue [due] to interrupted sleep," "social phobia," and "PTSD, lack of trust." (TR 1093-95, 1103, 1223, 2063-64.)

On January 27, 2014, Dr. Rivinus completed a second "disability assessment" at the request of Hamlin's attorney. (TR 2071.) He gave diagnoses of PTSD, major depressive

disorder, insomnia, panic disorder, GAD, and alcohol dependence in early remission, with a

GAF of 50. (TR 2071-72.) As in his previous report, Dr. Rivinus opined that Hamlin had

"occupational and social impairment with deficiencies in most areas, such as work, school,

family relations, judgment, thinking and/or mood which will severely impair her ability to work

now and in the future." (TR 2074.) He stated that Hamlin had extremely severe difficulties in

understanding complex directions, being reliable, being anxious/panicky/fearful, and being

paranoid/on guard. (TR 2073.) He wrote that Hamlin had severe difficulties in thinking clearly

under pressure, concentration and memory, solving problems, working on tasks, working with

others, and getting along with others. (TR 2072-74.) He described Hamlin as having "anxiety,"

"mental confusion," "panic reactions under stress," "flashbacks," "fatigue [due] to interrupted

sleep," "social phobia," and "PTSD, lack of trust." (TR 2072-74.)

     Dr. Rivinus also completed a series of short evaluations requested by the City of New

Bedford Department of Veterans Services & Benefits. (TR 393-397.) The first, on April 19,

2009, gives the diagnoses of major depressive disorder, adjustment disorder with depressed

mood, and complicated grief; prognosis of "guardedly optimistic with treatment;" probable

duration "3-6 months;" and found Hamlin unable to work. (TR 393.) The second, on May 11,

2010, listed a diagnosis of "major depression," prognosis "guarded," treatment of "antidepressant

meds & psychotherapy," probable duration of "1+ years," and found Hamlin unable to work.

(TR 394.) On November 29, 2010, Dr. Rivinus gave a diagnosis of "major depression,"

prognosis of "guarded – acute illness relapse," treatment of "psychotherapy," probable duration

"at least 8 weeks out of work," and projected that she would be able to work "on or about

2/1/2011." (TR 395.) On February 25, 2011, Dr. Rivinus gave a diagnosis of "major depressive

disorder – only in partial remission with treatment," "guarded" prognosis, treatment of

26

"medication management & psychotherapy," duration "life-long," and found Hamlin unable to

work. (TR 396.) On June 6, 2011, Dr. Rivinus gave a diagnosis of "major depressive disorder,"

prognosis "guardedly optimistic," treatment of "monthly therapy for med. management,"

duration "indefinitely," and found Hamlin unable to work. (TR 397.)

### 3. Hearing Testimony

At the administrative hearing, Hamlin was 51 years old. (TR 46.) She testified that she

lived alone in a New Bedford apartment. *Id.* She stated that she completed an Associate's degree

in Criminal Justice, and had an internship in a court in 2010. (TR 47-48.) She was unable to

complete the internship "because I couldn't function… I couldn't remember some things that

they asked me to do. Sometimes I wouldn't show up because I couldn't remember if that was the

day that I was supposed to be there." (TR 48.) Hamlin also obtained a CNA license in 2005, but

let it lapse because "I couldn't function in that field… I didn't show up when I was supposed to.

I couldn't lift the patients like I was supposed to." (TR 48-49.) These problems were caused by

alcohol, and "I just couldn't remember things. My mind was racing." (TR 49.) She could not lift

patients because she lacked strength and had "a torn, something torn in my shoulder." *Id.*

Hamlin mentioned receiving VA state benefits because of severe depression, and food

stamps. (TR 50-51.) She was not working at the time of her hearing, and last worked in 2009 to

2010. She left because "I went into severe depression. I couldn't function. I didn't show up. I, it

was too many people for me to be around when I was going through alcohol, lost." (TR 51.)

However, she reported she was not "actively" drinking at that time. *Id.*

From 1999-2002, Hamlin worked "off and on" at AFC Cable as director of materials.

(TR 52.) She left because "It got to be too much. I was forgetting things and wasn't ordering

things and I was lashing out." *Id.* Next, she worked as a customer service manager at Wal-Mart

in 2003. *Id.* Since 2010, she had not worked or looked for work, "[b]ecause I wouldn't be no good. I wouldn't function. The same thing would happen again and again. I can't be around too many people." (TR 53.)

Hamlin acknowledged using alcohol, and said the last time she consumed alcohol was prior to her hospital admission in July 2013. (TR 53-54). Prior to that admission, she drank half a gallon to a gallon of vodka every day. (TR 54.) She reported starting to drink in her thirties, triggered by flashbacks to sexual trauma and military experiences. *Id.* Hamlin said that her depression and anxiety did not improve when she was sober: "Because I still have lots of the sexual trauma. I still have thoughts of feeling worthless, not worthy, and even in my mind like planned a suicide. … Sometimes I don't know what's reality and what's real. I don't sleep." (TR 56.) She stated that her depression and anxiety were worse when she was sober: "[W]hen I drink it makes me forget everything." (TR 57.) She denied that her drinking affected her ability to work, "because I haven't been drinking and I just feel like in my head there's days that I don't want to live." (TR 69.) Even at times when she was drinking a gallon of vodka per day, "sometimes I would go in [to work] even after drinking. I don't know. … I haven't been drinking and my symptoms and everything is still the same like my depression…" *Id.* She admitted missing work due to drinking and stated she was "pretty sure" she lost a job on account of drinking.

Hamlin reported being depressed every day, manifesting as a lack of energy and desire for isolation: "I stay in my bed… most of the time my phone is shut off. I don't want to talk to nobody. I want everybody to leave me alone." (TR 58.) She noted that medications have not been effective in alleviating her symptoms. (TR 58-59.) Hamlin described having panic attacks "[m]aybe like once a month," during which she feels that she cannot breathe and thinks she's

having a heart attack. (TR 59-60.) To treat them, she does breathing exercises and takes clonazepam and quetiapine. (TR 60.) She reported "always thinking like thoughts of death and suicide and planning," and called the VA suicide hotline multiple times. (TR 74.) She reported one suicide attempt, in which she planned to jump off a bridge, but she called the VA and a friend came to get her. (TR 75.)

Hamlin stated that she drives twenty miles in a typical month, visiting the VA for appointments, the grocery store, the gas station, and City Hall. (TR 62-63.) Friends try to visit her, but she does not let them in. (TR 63.) She has one brother, but at the time of the hearing had not visited him for over a year. (TR 64.) She could not attend AA meetings because "it's too many people." (TR 65.) She does not attend religious services, go out for fun, or participate in hobbies. *Id.* She uses the computer only to pay bills and look at emails, and does not watch TV although she has it on "in the background." (TR 65-66.)

Hamlin described a typical day as waking up at 7:00 a.m., staying in bed, and "I sit in my head… I'm constantly thinking…" (TR 67.) She told the ALJ that she straightened up her apartment maybe once a week, and cleaned maybe once or twice a month. (TR 67-68.) She stated that her friend does her laundry for her. (TR 68.) However, Hamlin had had limited contact with that friend at the time of the hearing, and suspected he had relapsed. (TR 73.) She showered and changed clothes once every three days, spending lots of time in pajamas or sweatpants. (TR 72.)

Certified rehabilitation counselor Diane Dorr also testified at the hearing. (TR 81-88.) Dorr identified Plaintiff's past relevant work as a certified nurse's aide as semi-skilled, medium duty work; her work as a customer service manager as SVP 6, light duty work; her work as a

director of materials as SVP 5, light duty work; and her work as a unit associate as semi-skilled,

light work. (TR 51.)

> The ALJ asked Durr the following hypothetical question:

> Q: Ma'am, assume a person of the claimant's age, education and work
> experience, who has no exertion limitations. Work is limited to simple, routine,
> repetitive tasks, simple instructions. The person can adapt to routine stresses. The
> person can have occasional brief interaction and contact with the general public
> and occasional interaction with coworkers with no tandem tasks. Can that person
> do any of the claimant's past relevant work?

(TR 83.) Dorr testified that such a person could not do Plaintiff's past relevant work, but could

work as a cleaner, dishwasher, or hand packager. (TR 83-84.) The ALJ then posed another

hypothetical, with the same conditions as the first except with no interaction with the general

public. (TR 84.) Dorr responded with the same jobs. *Id.* The third hypothetical included lifting

and carrying twenty pounds occasionally, carrying ten pounds frequently; standing, walking, and

sitting for six hours; occasionally pushing, pulling, and reaching overhead with the left upper

extremity. *Id.* Dorr opined that such a person could work as a housekeeper, quality assurance

checker, hand packager, or collator operator. (TR 85.) The ALJ's final hypothetical included

being off task more than fifteen percent of the work day, being unable to maintain attention and

concentration for two hours, and being absent from work two days a month. *Id.* Dorr stated that

those limitations would preclude all work.

Plaintiff's attorney noted that some housekeeping jobs require contact with the public,

and Dorr estimated that limitation to preclude forty percent of available jobs, based on her

experience, education, and training. (TR 86.) Plaintiff's attorney also challenged the

qualifications of collator operator jobs available, since the *Dictionary of Occupational Titles* was

last revised in 1991. (TR 87.) Dorr disagreed that the job would require greater levels of

computer skill today. *Id.*

Plaintiff's attorney stated: "[Y]ou've seen how my client is emotionally today through the hearing. If she had this level of emotional instability at a job, would that be acceptable?" (TR 88.) Dorr acknowledged that it would not. Dorr also agreed that Dr. Rivinus' evaluation of "huge barriers to thinking clearly under pressure, concentration, learning new things, solving problems, starting and completing tasks, stamina and energy to do things for long periods, relating to others, working with others and… holding an eight-hour job" would be preclusive. *Id.* With that, the ALJ concluded the hearing. *Id.*

### III. <u>STANDARD OF REVIEW</u>

Title 42 U.S.C. § 405(g) provides, in relevant part:

> Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow . … The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive…

The court's role in reviewing a decision of the Commissioner under this statute is circumscribed:

> We must uphold a denial of social security disability benefits unless 'the Secretary has committed a legal or factual error in evaluating a particular claim.' *Sullivan v. Hudson*, 490 U.S. 877, 885, 109 S. Ct. 2248, 2254, 104 L. Ed. 2d 941 (1989). The Secretary's findings of fact are conclusive if supported by substantial evidence. *See* 42 U.S.C. § 405(g); *see also Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971).

*Manso-Pizarro v. Secretary of Health & Human Servs.,* 76 F.3d 15, 16 (1st Cir. 1996); *see Reyes Robles v. Finch*, 409 F.2d 84, 86 (1st Cir. 1969) (holding that "as to the scope of court review, 'substantial evidence' is a stringent limitation").

The Supreme Court has defined "substantial evidence" to mean "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see Irlanda Ortiz v. Secretary of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991). It has been explained that:

> In reviewing the record for substantial evidence, we are to keep in mind that 'issues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the Secretary.' The Secretary may (and, under his regulations, must) take medical evidence. But the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for him, not for the doctors or for the courts. We must uphold the Secretary's findings in this case if a reasonable mind, reviewing the record as a whole, could accept it as adequate to support his conclusion.

*Lizotte v. Secretary of Health & Human Servs.*, 654 F.2d 127, 128 (1st Cir. 1981) (quoting *Rodriguez v. Secretary of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981)). In other words, if supported by substantial evidence, the Commissioner's decision must be upheld even if the evidence could also arguably admit to a different interpretation and result. *See Ward v. Commissioner of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000); *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

Finally it has been noted that,

> Even in the presence of substantial evidence, however, the Court may review conclusions of law*, Slessinger v. Sec'y of Health & Human Servs.*, 835 F.2d 937, 939 (1st Cir. 1987) (per curiam) (citing *Thompson v. Harris*, 504 F. Supp. 653, 654 [D. Mass.1980]), and invalidate findings of fact that are 'derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts,' *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

*Musto v. Halter*, 135 F. Supp. 2d 220, 225 (D. Mass. 2001).

# IV. DISCUSSION

In order to qualify for DIB, a claimant must prove that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Title 42 U.S.C. § 423(d)(1)(A). Additionally, the Social Security Act precludes a finding of disability "if alcoholism or drug addiction would… be a contributing factor material to the Commissioner's determination that the individual is disabled." Title 42 U.S.C. 423(d)(2)(C).

In this case, in determining Hamlin's eligibility for benefits, the ALJ conducted the familiar five step evaluation process to determine whether an adult is disabled. *See* 20 C.F.R. §§ 404.1520(a); *Goodermote v. Secretary of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982); *Veiga v. Colvin*, 5 F. Supp. 3d 169, 175 (D. Mass. 2014). At the first step, the ALJ found that Hamlin had "not engaged in substantial gainful activity since November 30, 2009, the alleged onset date [of disability]." (TR 11.) At the second, he found that Hamlin suffered from "major depressive disorder, anxiety disorder and alcohol use disorder," and that these are "severe" "medically determinable impairment[s]." (TR 10-11.) At step three, the ALJ determined that Hamlin's impairments, "including her substance use disorder," met the criteria of listings in 20 C.F.R. Part 404, Subpart P, Appendix 1, specifically sections 12.04 (affective disorders) and 12.09 (substance abuse disorders). (TR 14.) Because this finding at step three means that Hamlin is disabled when all impairments collectively are taken into account, the ALJ did not proceed to steps four and five. (TR 29.)

When medical sources show evidence of DAA, the ALJ must therefore consider whether that DAA is material to the disability determination. 20 C.F.R. § 404.1535; Social Security

Ruling ("SSR") 13-2P, 2013 WL 621536 at *2 (S.S.A., Feb. 20, 2013). The SSA's Policy

Interpretation Ruling sets out a six-part test for DAA materiality, to be followed after the ALJ

determines a claimant is disabled under the five-part test above. SSR 13-2p, 2013 WL 621536 at

*5-8. The ALJ properly proceeded to this six-part test after he found Hamlin disabled. He

addressed the steps out of order, as permitted by the policy. *Id.* ("Although the steps are in a

logical order from the simplest to the most complex cases, we do not require our adjudicators to

follow [the steps] in the order we provide.")

At step one, the ALJ found evidence that Hamlin suffers from alcohol use disorder. (TR

12.) At step two, he found Hamlin disabled "considering all impairments, including DAA." (TR

14, finding that "claimant's impairments, including her substance use disorder" met a listed

impairment.) At step three, DAA was not the only impairment. (TR 11, severe impairments also

included "major depressive disorder" and "anxiety disorder.") At step 4, he appears to find that

the other impairments would be disabling by themselves while Hamlin is abusing alcohol. (TR

28, "the criteria of listing 12.04 are met.")[12] At step 5, he found that the DAA affects the

claimant's medically determinable impairment. (TR 29, "If the claimant stopped the substance

use, the remaining limitations would not meet or medically equal the criteria of listings 12.04

[affective disorders] or 12.06 [anxiety disorders]"; TR 33, "[T]he evidence clearly supports a

finding that [Hamlin's] depression and anxiety improve when she is sober.") Finally, at step 6, he

determined that the other impairments would improve to the point of nondisability in the absence

of DAA. (TR 35, "[T]he claimant would not be disabled if she stopped the substance use.") The

---

[12] While the decision is somewhat unclear on this point, the policy explicitly allows adjudicators to skip
steps. SSR 13-2P, 2013 WL 621536 at *5 ("For example, when DAA is the only impairment adjudicators
can go directly to step three and deny the claim…")

SSR notes that cases which reach this sixth step are "some of the most complex cases for the *DAA materiality* analysis." SSR 13-2p, 2013 WL 621536 at *7.

In her motion, Plaintiff argues that the ALJ erred in the analysis and the outcome of his determination that her DAA was material to her disability. (#17 at 5-11.) She also asserts that the ALJ failed to consider Hamlin's limitations in attendance and pace in determining RFC. (*Id*. at 11-12.)

### A. Hamlin carried the burden to prove that DAA was not material.

Hamlin first contends that the ALJ erred because he found her disabled at step 5, for which the Commissioner bears the burden of proof. (#17 at 5.) This is a mischaracterization of the ALJ's process. As described above, the ALJ determined that Hamlin's impairments including DAA were disabling at step 3. (TR 14-29.) He then properly proceeded to analyze whether DAA was material to the disability. (TR 29-36.) Although the ALJ could have been clearer about the materiality calculus, he did in fact follow the required analysis. Since materiality does not fall under step 5 of the initial procedure, the claimant, not the commissioner, bears the burden of proof. It is well established that "the claimant bears the burden of proving his or her alcohol abuse is not a material factor contributing to the determination of disability." *Benelli v. Comm'r of Soc. Sec*., No. 14-cv-10785-MBB, 2015 WL 3441992, at *22 (D. Mass. May 28, 2015) (citing *Cage v. Comm'r of Soc. Sec*., 692 F.3d 118, 123 (2nd Cir. 2012) and *Brueggemann v. Barnhart*, 348 F.3d 689, 693 (8th Cir. 2003) (additional citations omitted)). *See also* SSR 13–2p, 2013 WL 621536, at *4 (plaintiff "continues to have the burden of proving disability throughout the drug addiction or alcoholism materiality analysis"). Therefore, this argument is unavailing.

**B. The ALJ properly made the materiality determination.**

Hamlin also asserts that medical experts, not the ALJ, must make the materiality determination. (#17 at 9-11.) This assertion, for which Plaintiff cites no relevant authority, is contradicted by clear Social Security policy and caselaw. The adjudicator is responsible for this decision: "the ALJ or Appeals Council determines whether DAA is material to the determination of disability." SSR 13-2p, 2013 WL 621536 at *14. Also, "[t]o support a finding that DAA is material, we must have evidence in the case record that establishes that a claimant with a co-occurring mental disorder(s) would not be disabled in the absence of DAA. Unlike cases involving physical impairments, we do not permit adjudicators to rely exclusively on medical expertise and the nature of a claimant's mental disorder." SSR 13-2p, 2013 WL 621536 at *9. Substantial caselaw also refutes Hamlin's position. The Second Circuit found that requiring dispositive medical evidence on the question of materiality "would unnecessarily hamper ALJs and impede the efficient disposition of applications in circumstances that demonstrate DAA materiality in the absence of predictive opinions." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 126 (2nd Cir. 2012) (citing *McGill v. Comm'r of Soc. Sec.*, 288 Fed. Appx. 50, 53 (3rd Cir. 2008), for the proposition that "any determination that DAA is material to the finding of disability [need not] be based on expert psychiatric opinion evidence"). *See also Fischer v. Colvin*, No. 15-1041, *slip op.* at 11 (1st Cir. July 29, 2016) (the ALJ is "a lay individual with no required medical training" whose decisions necessarily "involve some degree of ambiguity and inference.")

**C. Dr. Hoy-Watkins' opinion was not contrary evidence.**

Hamlin asserts that the ALJ failed to consider Dr. Hoy-Watkins' opinion that Hamlin's alcohol use was not material to her disability. (#17 at 7-9.) It is true that the ALJ may not simply

ignore evidence contrary to his determinations. *See Martin v. Apfel,* 118 F. Supp. 2d. 9, 15

(D.D.C. 2000). However, Dr. Hoy-Watkins agreed with Dr. Fischer's opinion: that Hamlin was

not disabled at a time when she was not actively drinking. (TR 686-90.) The ALJ considered Dr.

Fischer's opinion and explained why he assigned it great weight. (TR 33.) Therefore, Dr. Hoy-

Watkins' opinion does not add anything to the analysis, and the ALJ was not required to mention

it specifically.

### D. The ALJ properly considered opinions of treating sources.

Next, Hamlin argues that the ALJ neglected to consider evidence relevant to the

materiality determination, namely Dr. Rivinus' and Nurse Cobb's[13] opinion reports. (#17 at 6-7.)

The ALJ regarded these reports as useful for assessing Hamlin during the time she was actively

drinking: "I have given the June 2013 assessments by Nurse Cobb and Dr. Rivinus great weight

in finding that the claimant meets the criteria of listing 12.04 and 12.09 while abusing alcohol."

(TR 28.) He did not find them useful for assessing Hamlin's period of sobriety, and justified his

conclusion: "I have given little weight to the June 2013 assessments by Nurse Cobb and Dr.

Rivinus, as the claimant was actively drinking at the time they were written and had been

drinking for months before they were written." (TR 33.) This assertion is supported by the

medical records, which show that Hamlin may not have fully disclosed the extent of her drinking

to her medical providers. The ALJ also provided a well-reasoned explanation for according little

weight to Dr. Rivinus' January 2014 disability assessment. (TR 34.) The 2014 assessment is

"essentially the same" as the 2013 assessment, but with a lower GAF score. *Id.* The ALJ

concluded that Hamlin had in fact improved following her inpatient treatment, citing details of

Dr. Rivinus' treatment records. *Id.*

---

[13] Since Nurse Cobb is not a physician, he cannot provide evidence to establish an impairment. 20 CFR
404.1513.

In general, opinions of medical providers who have actually treated the claimant are primary sources of evidence:

> Treating physicians' opinions are ordinarily accorded deference in Social Security disability proceeding[s], *Richards v. Hewlett–Packard Corp.*, 592 F.3d 232, 240 n. 9 (1st Cir. 2010), because these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

*King v. Colvin*, 128 F. Supp. 3d 421, 436 (D. Mass. 2015) (citing 20 C.F.R. § 416.927(c)(2)) (internal quotation marks omitted). "Thus, a treating-source opinion is entitled to controlling weight, if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record.'" *Id*. (quoting 20 C.F.R. § 416.927(c)(2)). However, treating-source opinions do not always merit controlling weight, and

> the ALJ considers an array of factors to determine what weight to grant the opinion, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the degree to which the opinion can be supported by relevant evidence, and the consistency of the opinion with the record as a whole. *See* 20 C.F.R. § 404.1527(c)(2)-(6); 416.927(c)(2)-(6). Further, the regulations require adjudicators to explain the weight given to a treating source opinion and the reasons supporting that decision. *See* 20 C.F.R. § 404.1527(c)(2); 416.927(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").

*Bourinot v. Colvin*, 95 F. Supp. 3d 161, 176 (D. Mass. 2015); *see Conte v. McMahon*, 472 F. Supp. 2d 39, 48 (D. Mass. 2007).

Here, the ALJ explained his rationale for according Dr. Rivinus' opinions less weight, relying upon substantial record evidence to do so. Although the records paint a picture of a truly sympathetic claimant, the Court does not have the power to overturn the ALJ's well-reasoned

findings that are supported by substantial evidence, as they are in this case. *Covel v. Astrue*, No. CIV.A. 09-10866-PBS, 2010 WL 3703267, at *5 (D. Mass. Sept. 16, 2010) (on review, the Court "must affirm the [ALJ's] findings if they are supported by substantial evidence") (quoting *Cashman v. Shalala,* 817 F.Supp. 217, 220 (D. Mass. 1993), and citing *Rodriguez Pagan v. Sec'y of Health & Human Servs.,* 819 F.2d 1, 3 (1st Cir.1987) for the proposition "that the ALJ's determination must be affirmed, 'even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence'").

Since the ALJ's materiality determination is affirmed, Hamlin's application for benefits must be denied under the Social Security Act. *Schell v. Astrue*, No. CIV.A. 10-10346-GAO, 2012 WL 745024, at *5 (D. Mass. Mar. 7, 2012) (citing 42 U.S.C. § 423(d)(2)(C)). Therefore, the Court need not address Hamlin's other arguments.

## V. <u>CONCLUSION</u>

For all the reasons stated, it is ORDERED that the Plaintiff's Motion for Order Reversing Decision of the Commissioner (#17) be, and the same hereby is, DENIED, and that Defendant's Motion to Affirm the Commissioner's Decision (#20) be, and the same hereby is, ALLOWED. Judgment shall enter for Defendant.

<div style="margin-left:50%;">
/s/ M. Page Kelley
M. Page Kelley
United States Magistrate Judge
</div>

August 3, 2016